Donnelly v. State.

---

## JAMES P. DONNELLY *vs.* THE STATE.

1. Upon a writ of error, sued out by a person convicted of a felony or misdemeanor, the personal appearance of the plaintiff in the appellate court is not necessary to give jurisdiction. He may assign his errors by counsel. The court of review may render their judgment of affirmance or of reversal in his absence; hence his personal presence is not a *technical necessity*. Nor is it a *legal right*, to which he is entitled, if demanded. Whether a court of error will grant to a convict in custody a *habeas corpus* to bring him before them, upon reasons founded on the particular circumstances of his case, is a matter of sound discretion, and their refusal cannot be well assigned as error.

2. The court will not permit a defendant, under the privileges of a cross-examination, substantively to establish his points of defence by witnesses of his opponent.

3. In the admission of testimony, much, as to the order of time, must be left to the discretion of the court of trial, and their decision in such matter is not a ground of error.

4. When a person has received a mortal wound, his declaration as to the cause of the injury, made immediately after the blow, and in immediate connection with his statement of the manner of his receiving it, may be received in evidence as part of the *res gestæ*.

5. Such declaration, made in the presence and hearing of the accused, if not in the course of a judicial inquiry, nor under circumstances which would render a reply inexpedient or improper, is also admissible for showing his express or tacit assent to the statement. When a matter is stated in the presence of a person, which injuriously affects his rights, and

Donnelly v. State.

he understands it, the statement and his reply or silence are both admissible.   The effect which the testimony should have is left to the jury.

6. "Reasonable doubt" defined.

7. To constitute murder in the first degree, under our statute, no particular length of time need intervene between the formation of a purpose to kill, and its execution.   It is enough that the design be fully conceived, and purposely executed.

8. What statements may be received in evidence as *dying declarations,* and the principle upon which such are excepted from the exclusion applicable to hearsay.   Before such statements can be detailed before the jury, it must clearly appear to the court that the declarant, at the time he made them, was under the sense of impending death; that he had an abiding impression of almost immediate dissolution.   Such a sense and impression are held to lay upon him as strong an obligation to speak the truth as is imposed by an oath in a court of justice.

9. Defect of religious faith in a witness is never presumed.   It lies upon the objector to prove that he is a disbeliever.   The question must be determined by the court, as applicable to his admissibility.

10. If a person be charged in several counts of an indictment with murdering another, by a different instrument in each count, and the evidence produced would support a conviction upon each of the counts, and it be proved that the deceased suffered the same kind of death as would result from each of the instruments named, a general verdict of guilty of the felony charged is not repugnant, inconsistent, impossible, or irreconcilable, but is good, and will support a general judgment.

---

In error to the Supreme Court.

The writ of error in this case being returned, the counsel for the plaintiff in error alleged diminution of the record in the following matters, to wit: the record of the case, which was returned to the Supreme Court, having annexed thereto the bills of exception made at the trial; also a certain order of the said Supreme Court denying a *habeas corpus* to the said plaintiff, to bring him before the said court to assign errors, and be present at the hearing of said cause; also an order of said court striking out certain of the errors assigned before them, and also the original assignment of errors, containing the errors so stricken out; whereupon, on motion of the counsel for the plaintiff in error, the court ordered that a *certiorari* do issue to the Supreme Court for bringing up to this court forthwith the record and bills of exception, and the orders and original assignment of errors aforesaid.

The counsel for the plaintiff in error then presented the following assignment of errors:

And the said James P. Donnelly, by Amzi C. McLean, his attorney, comes and says that in the record and proceedings aforesaid, and also in the giving of judgment, there is manifest error in this—

1. That at the trial of the said indictment before the said Court of Oyer and Terminer and General Jail Delivery of the county of Monmouth, the said court did exclude and overrule evidence offered in behalf of the said James P. Donnelly, which was admissible in the law, (*pro ut* the first bill of exceptions.)

2. And there is also error in this, that at the said trial, the said court did admit and allow evidence to be given against the said James P. Donnelly, which was illegal and inadmissible in the law, (*pro ut* the second, third, fourth, fifth, sixth and seventh bills of exceptions.)

3. And there is also error in this, that the charge of the said court to the jury was contrary to law, (*pro ut* the remaining bills of exceptions.)

4. There is also error in this, that the said court, in and by their said charge to the jury, did invade the province of the jury, by arguing the facts of the case to the jury against the prisoner at the bar, and gave a partial view of the evidence against him, and omitted the circumstances in his favor.

5. And there is also error in this, that the Supreme Court struck out from the assignment of errors made before them the last above-mentioned errors herein fourthly enumerated, and refused to hear the same argued.

6. And there is also error in this, that the verdict of the jury is repugnant, inconsistent and void.

7. And there is also error in this, that the said Supreme Court refused to grant to the said James P. Donnelly a writ of *habeas corpus* to bring him before the said Supreme Court to assign his errors in the premises, and be present at the argument of the cause in the said court, although

he, the said Donnelly, by his counsel, applied for the said writ of *habeas corpus* upon the return of the writ of error from the court below to the said Supreme Court.

8. And there is also error in this, that the said Supreme Court tried the said cause upon the said writ of error, and heard the same in the absence of the said James P. Donnelly, notwithstanding the said Donnelly, by his counsel, applied to the said Supreme Court for process to enable him to be present at the said trial and hearing.

9. And there is also error in this, that judgment was given against the said James P. Donnelly, whereas judgment should have been given in his favor; wherefore the said James P. Donnelly prays judgment, and that the judgment aforesaid, for the errors aforesaid, and other errors found and being in the record and proceedings aforesaid, may be reversed, annulled, and altogether held for nothing; and that the said James P. Donnelly may be restored to all things which he has lost by occasion of the said judgment; and that the court here may proceed to examine the record and proceedings aforesaid.

The counsel for the state moved to amend the assignment of errors, by striking out the fourth, fifth, seventh and eighth errors.

After argument of counsel, the court ordered the fourth and fifth errors to be stricken out, and decided to retain the seventh and eighth.

The state then joined in error.

The facts in this case, and the points relied on for a reversal of the judgment below, sufficiently appear in the report of the case in the Supreme Court, (*ante* page 463) and by the opinions delivered in this court.

Argued at November Term, 1857, by *Bradley* and *Pennington*, for the plaintiff in error, and *Joel Parker*, prosecutor of Monmouth Pleas, and *William L. Dayton*, attorney-general, for the state.

Donnelly v. State.

OGDEN, J. The case comes before us by a writ of error to the Supreme Court. It appears that the plaintiff in error was indicted in September last, at a Court of Oyer and Terminer and General Jail Delivery, in the county of Monmouth, for the murder of Albert S. Moses, on the first day of August, 1857, at "the Sea View House," in the township of Middletown, in said county; was tried by a jury and convicted of murder in the first degree, and sentenced to be executed on the eighth day of January next.

After the rendition of the judgment a writ of error was allowed by the Chancellor, to remove the proceedings into the Supreme Court, which was returned, with the record, on the 12th day of November last. Bills of exceptions, sealed at the trial, also were returned with the writ.

That court, finding no error in the record or proceedings, on the twenty-first day of November, affirmed the judgment in all things.

Upon an application in behalf of Donnelly, the Chancellor granted a second writ of error to remove the record and proceedings had before the Supreme Court into this court of the last resort. The writ has been returned, together with the record of the judgment and the proceedings of the Supreme Court, and of the Court of Oyer and Terminer, at which the conviction was had.

On the return of the writ the counsel of the prisoner obtained a *certiorari*, by which an order, made by the Supreme Court, denying an application for the writ of *habeas corpus* to remove the prisoner before that court, has been brought before us.

The plaintiff, by his counsel, has assigned various errors, alleged to have occurred in the Court of Oyer and Terminer, and also in the Supreme Court. On application of the attorney-general, before joining in error, this court ordered the 4th and 5th assignments of error to be stricken out. The practice is sanctioned by the court in

the case of *Ward* v. *Ward*, 2 *Zab.* 710, and by other authorities. Thereupon the attorney-general, in behalf of the state, filed the general joinder in error. As the seventh and eighth assignments of error complain of the action of the Supreme Court upon an application for a *habeas corpus*, and of the court's hearing and determining the cause in the absence of the prisoner, it is proper for us to consider those assignments at the outset; because, if material error was thereby committed by the Supreme Court, prejudicial to the legal rights of the party, the subsequent action and judgment of that court should be for nothing holden; and the case, with a reversal of their judgment, should be remitted, for them to proceed therein according to law. It is not contended that a fatal error in those proceedings of the Supreme Court would affect the judgment of the Court of Oyer and Terminer, but it is conceded that the cause would be re-argued before the Supreme Court, in the presence of the prisoner.

The first and most material inquiry is, whether upon a writ of error sued out by a person convicted of a felony, his personal presence in the appellate court is necessary to give jurisdiction, or rather, the ability to examine the record of the inferior tribunal.

The argument of the plaintiff's counsel was drawn entirely from the ancient practice and precedents in England, whereby it appears that the prisoner always assigned his errors in person. In the English courts, a person indicted for a felony could not at common law appear by attorney or by counsel. His presence was required in the court of trial, and also in the appellate courts, in every stage of the proceedings. Upon the return of his writ of error it was necessary for him to follow the record, and at the proper time and place, to assign in person the errors of which he complained. The appellate court could not proceed to review the record of the court below until the issues of error were made up; and unless the plaintiff was before them he would lose the whole benefit of his

writ. Of consequence, a well-established mode prevailed in those courts of removing the convict from custody in one prison, and placing him in charge of a proper officer at the appellate court, where he was securely kept, and had the opportunity of prosecuting his writ of error to effect.

In these United States a different system prevails in criminal proceedings. By the constitution of the federal government and the constitutions of the several states, in all criminal prosecutions, the accused shall have the assistance of counsel in his defence. In the "act regulating proceedings and trials in criminal cases," in this state, the court before whom a person shall be tried upon an indictment is required to assign to such person, if not of ability to procure the same, such counsel as he or she may desire, to whom such counsel shall have free access at all seasonable hours. No authority in this country has been cited showing that a plaintiff in error, under sentence of the court of trial, has been removed into an appellate court by *habeas corpus*, or has assigned his errors *otherwise* than by counsel. The practice of errors being assigned by counsel has been uniform in this state, as far as we have reported cases, and a similar practice prevails in our sister states. There is a statute in New York "that no person indicted for any felony shall be tried, unless he be personally present at the trial ;" but the practice under that act shows that the provision has not been construed to apply to an argument on writ of error before an appellate court, which deals only with the law of a case. But if the presence of a prisoner in court, so that he may assign errors in person, be not necessary under our practice, yet it is said that the judgment of the Supreme Court upon the errors assigned could not legally be pronounced in his absence.

This insistment involves the nature and effect of the judgment of an appellate court. If the writ of error *per*

*se* changes the legal efficacy of the judgment below, then a new substantive judgment should be rendered by the appellative court, containing in a capital case the sentence of execution. But such is not the office of the writ. It removes the record of the judgment below; and the appellate court, in adjudicating upon the record, either affirms or reverses the judgment. In case of affirmance, it is considered, by them, that the judgment below do in all things stand in full force and effect. No new sentence is pronounced, but the punishment adjudged by the court of trial is executed by virtue of their judgment as *first* pronounced. If the executive officer of the inferior court does not receive notice that the judgment is reversed, it will be his duty to execute the culprit according to law. Nor is it necessary that the prisoner should be present in court to receive judgment of *reversal*. If a discharge from his imprisonment it to follow when such a result (*it*) can speedily be effected by subsequent proceedings. A controlling reason for requiring the presence of a culprit in court, when a corporal punishment is to be adjudged, is that it may not fail of being executed. We have no process by which a person at large may be arrested, and placed in the sheriff's hands to undergo a sentence of imprisonment or of execution pronounced in his absence. Upon a careful examination of the alleged error in this aspect of it, we think, in the language of the Supreme Court used in this case, " it must be considered as settled law in this state, that in proceedings upon writ of error, the personal presence of the prisoner in court is not a *technical necessity.*" He may appear and act by counsel, and judgment, either of affirmance or of reversal, may be pronounced in his absence. But the point has been presented in another aspect. It is argued that a prisoner's presence in the appellate court is a *legal right*, to which he is entitled, if demanded by him. If this be so, and the refusal of the Supreme Court in this case to award the *habeas corpus* was erroneous, the judgment should be re-

versed, although the court had jurisdiction of the case in his absence. Upon what was his alleged right based? Not upon his inability to employ counsel, or his desire to assign errors in *person*, but upon his wish to be present, and to hear the arguments, and to have the power of making suggestions to his counsel, during the discussion of the issues of error. A similar application has never before been made in this state upon a writ of error, nor upon a case reserved from the Oyer. We are not prepared to say that the prisoner had a *legal right* to be present, which was violated by the Supreme Court, because we cannot find any principle upon which such adjudication can be placed. The question is one now-presented to this court for the first time. The inconveniences and dangers consequent upon awarding and returning the writ should have no effect in abridging the rights of a prisoner; yet when we are without authority upon the subject, and a judicial decision is asked, without presenting the principle upon which it should be made, those considerations are entitled to their proper weight.

The other reasons urged before the Supreme Court for an allowance of the writ were addressed to their discretion; and their disposition of those reasons is not a subject for review in this court. We are of opinion that the seventh and eighth errors have not been well taken.

This result brings us to an examination of the errors alleged to have been committed in the court of trial.

The first, second, and third assignments of errors are founded upon the bills of exceptions sealed in the Court of Oyer and Terminer.

The first bill was prayed because the court would not permit the counsel for the defendant, upon the cross-examination of a witness, to inquire into a matter not examined into by the prosecution. The objection was raised as to the time of introducing the evidence, and not against the facts sought to be established. The ruling of the court was proper. No injury was done to the defendant,

as it appears that the witness was recalled after the defence was entered upon, and was fully examined upon the matter contained in the question, which was overruled.   It is correct practice not to permit a party under the privileges of a cross-examination, substantively to establish his points of defence.

The third exception, also, rests upon the time when the question objected to was put to the witness.   After the counsel for the prisoner had cross-examined the witness, the prosecution asked him "where Donnelly was standing on the piazza when he was talking to him?"   The counsel for the defence insisted that the inquiry could only have been made upon the first examination of the witness.   The court correctly ruled that the question should be answered.   In the admission of testimony much, as to the order of time, must be left to the sound discretion of the presiding judge, and his decision in such matters is not a ground of error.

Mr. Smith, a witness produced by the state, had testified that Moses, after he was stabbed, told him where to look for money, in room 36, where he slept that night; that he had found $91 there, between the two mattresses, in a handkerchief, done up in three different parcels.   He then was asked by the prosecution, "how much money did Moses say there was?"   The counsel for the defendant objected to the question.   The court overruled the objection, and the second bill of exceptions was sealed upon that decision.   The question was legal and important in several aspects.   The answer, if correctly made, would tend to show that Moses *then* retained his faculties, and had distinct impressions of the occurrences which happened immediately preceding his being injured; which fact it was material for the state to establish.

The only *motive* which the state could impute to the defendant for committing so foul a deed, was the design of regaining money from the possession of the deceased; and it was material, for the purpose of connecting that

money with the sum for which defendant was deficient, to show that the deceased knew how much money there was in the place of deposit. It also was material for the state to establish that the deceased, from the time that he became conscious of the extent of his injury, was impressed with the belief of his speedy death. In answer to the question, the witness testified, that " Moses said there was $91 in different parcels ; he said $61 of it was his, and the rest belonged to Mr. Lent. He told me the money was in his bed, between the mattresses, wrapped up in a bundle. He told me he wanted the $61 sent to Mrs. Conklin, his mother, who lived in Locust street, Philadelphia.'

This point of the answer was not objected to when made, and it was proof of a testamentary disposition of his effects ; which fact is always admissible in showing that the declarant was in immediate apprehension of approaching death. If he had not mentioned the amount of money which he supposed was in the bed, and how much of it belonged to himself, he could not have made an intelligible testamentary disposal of his own portion of it. The fact of making such a disposition of his money was so intermixed with the amount under his own control, that proof of the latter necessarily was involved in the proof of the fact ; and the admission of the whole statement did not invade the rule that the particulars of a will are not receivable in evidence for establishing in the mind of the testator a sense of rapidly approaching death. I am of opinion that the question and answers were properly admitted in evidence by the court. The seventh exception was taken because the court permitted John W. Round, a witness produced by the state, to answer the following question : " What did Moses say, in the presence of Donnelly, was the occasion of Donnelly's doing it ? " This witness was one of the first persons who entered Moses' room after the alarm, and to whom he cried out immediately, " *Oh! I am murdered.*" It appears that

he was out and in the apartment several times. This question should be examined in two aspects of it: first, whether Moses' declaration, as to the cause of his injury, was competent as a part of the *res gestæ;* secondly, whether it was competent for showing an express or implied admission by Donnelly of the truth of the statement. No person had seen either the prisoner or the deceased, from the time they left the hall together, on the evening of the 31st, until after Donnelly was called by Mr. Smith, on the morning of the first. In the interval the deceased had received a mortal wound, to which no living witness could speak but the perpetrator of it and himself. He had declared to the first person who came into his room, that his wound was inflicted by a murderous stab. The *cause* of the injury, stated in such immediate connection with the *manner* of his receiving it, and so shortly after it *was received,* in my opinion, may be admissible in evidence, as a part of the *res gestæ.*

The introduction of testimony of this nature, and upon this principle, must very much be confided to the discretion of the judge, who has become familiar with all the antecedents in the conduct of the cause. 3 *Cushing* 184, *Commonwealth* v. *M'Pike.*

The second aspect of the question is of the greater importance to the prisoner; because, upon the view first taken, it was immaterial whether he was present or not.

The deceased had previously declared that Donnelly inflicted the blow, and it became material for the jury to know whether the declarations or conduct of Donnelly corroborated the insistment of the deceased. The bill of exceptions does not clearly show when the declaration of Moses was made. If it appeared that it was made in the course of a judicial inquiry, or when circumstances existed which rendered a reply inexpedient or improper, or that fear, doubts of his rights, or a belief that his security would be better promoted by silence than by a response, governed him at the time, then the testimony

should not have been admitted; for the reason that the jury, in such case, ought not to have been allowed to infer anything against the prisoner from his silence. But it does not appear from proofs, nor by fair implication, that at the time referred to, the defendant was surrounded by any such excusing circumstances. The *quasi judicial* investigation instituted by Coroner Connery, of the city of New York, improper and informal as it was, might have restrained the accused from denying or replying to the statement of Moses, and would have protected him from having any unfavorable inference drawn from his silence. But that mock proceeding could not have been in progress when the declaration inquired about was made by Moses, because Mr. Connery, before this time, had testified that Moses did not state to him in Donnelly's presence why he (Donnelly) did it. The statement of Moses, to which the attention of the witness was called, appears to have been made in the absence of Mr. Connery; for if he then had been conducting his semi-official inquiries after the truth of the case, he certainly would have recollected so important a feature in the investigation.

The answer to the question would derive its value from its disclosing a direct or an implied admission, by Donnelly, of the truth of the account which Moses then gave of the occurrence, and of the occasion which caused it, and not from the fact of the statement being a *dying declaration of Moses*. When a matter is stated in the hearing of one, which injuriously affects his rights, and he understands it, and assents to it, wholly or in part, by a reply, both are admissible in evidence; the answer, because it is the act of the party, who is presumed to have acted under the force of truth, and the statement as giving point and meaning to the action. So, also, silence, unless it be accounted for by some of the circumstances which have been specified, or by other sufficient reasons, may be taken as a tacit admission of the fact stated; because a person knowing the truth or falsity of a statement af-

fecting his rights, made by another in his presence, under circumstances calling for a reply, will naturally deny it, if he be at liberty so to do, if he does not intend to admit it.

Whatever is said to a prisoner on the subject matter of the charge, to which he made no direct reply, is receivable as evidence of an implied acquiescence on his part. 5 *Car. & Payne* 332. The admissibility of this evidence is all that can be determined on a writ of error. Its effect under the circumstances of the case, was committed to another forum.

The witness, Round, answered that " Moses said he had won from Donnelly, the previous night, $55 ; that Donnelly had murdered him to recover the money ;" and the witness added that " Donnelly did not reply, to his knowledge."

The influence which such testimony should have upon the minds of jurors, as has already been remarked, is a different question from its legal admissibility. All the circumstances of time and occasion should be considered by them, when estimating the value of the implied admission, in rightly determining the question in issue. The exception to this ruling of the judge has not, in my judgment, been sustained.

The *thirteenth* exception complains of " the charge of the court, on the subject of giving to the defendant the benefit of any reasonable doubt."

The following language was employed by the presiding judge : " The question is, did the defendant do it ? And this the state is bound to prove to you beyond all reasonable doubt. By reasonable doubt, is not meant absolute certainty. There is no such thing as absolute certainty in human affairs. But the proof must be such as to exclude from your mind all reasonable doubt of the guilt of the accused. * * * * * If, upon a careful review of all the evidence, you ask your own inward conscience, is he the guilty one ; and it answers, I doubt if he

Donnelly v. State.

is, you should acquit. But if the answer is, I have no doubt of it, you should say so, and leave the consequences to Providence. Did the defendant do this?"

The question raised before us is, whether the description of a reasonable doubt, given by the court to the jury, and the test which he proposed to them, whereby to try the effect which the evidence, taken as a whole, should legally have upon their verdict, was erroneous and prejudicial to the defendant. There is scarcely an indictment of any moment tried in our criminal courts where the judge is not required to charge the jury upon the question, what a reasonable doubt is in the eye of the law. Upon a careful search of treatises and reports of trials, I have not found an answer more satisfactory to my mind, than that which was given by Ch. Just. Shaw, upon the trial of John C. Webster. He said "it is a term often used, probably pretty well understood, but not easily defined. It is not a mere possible doubt; because every thing relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge. The burthen of proof is on the prosecution." "If upon such proof there be reasonable doubt remaining, the accused is entitled to the benefit of it by an acquittal. The evidence must establish the truth of the fact to a reasonable and moral certainty, a certainty that convinces and directs the understanding, and satisfies the reason and judgment of those who are bound to act conscientiously upon it. This we take to be proof beyond reasonable doubt; because if the law should go further than this, and require absolute certainty, it would exclude circumstantial evidence altogether."

The jury were told, in the present case, carefully to examine all the evidence, and if it failed to convince them

that the defendant was guilty, he was entitled to an acquittal. I have not been able to detect anything in that part of the charge which is not supported by law, or which could have abridged the defendant's chance for an acquittal.

The *fourteenth* bill of exceptions was assigned to that part of the charge, in which the degrees of murder, created by our statute, were defined. The court held that to constitute murder in the first degree, it was not necessary that the premeditation and deliberation should be for any specified period before the fatal act; that it is sufficient if they exist the moment before and at the infliction of the mortal blow.

In the case of *The People* v. *Clark*, 3 *Selden* 385, the Court of Appeals in New York held "that an intention to kill, existing at the instant of striking the fatal blow, is a premeditated design, within the meaning of their statute."

This question was fairly presented to the vigorous and accurate mind of Ch. Just. Hornblower, in the case of The State *v.* Spencer, tried in the Hudson Oyer and Terminer in this state. He there ruled that the premeditation, or intent to kill, need not be for even a minute. "If the jury believe there was a design and determination to kill, distinctly formed in the mind, at any moment before or at the time the pistol was fired, it was a willful, deliberate, and premeditated killing, and therefore murder in the first degree."

The like view of the statute, it is believed, has been given upon several trials for murder, which since have taken place in this state.

In the opinion recently read in this case, in the Supreme Court, by Ch. Just. Green, he has succinctly and accurately stated the law, as we believe it to be, in the following language: "To constitute murder in the first degree, under this clause of the statute, there must be an intention to take life. No particular length of time need

intervene between the formation of the purpose to kill and its execution.

It is not necessary that the deliberation and premeditation should *continue* for an hour, or a minute. It is enough that the design to kill be fully conceived and purposely executed."

I cannot perceive how any view of this statute, which might have been taken by the court of trial, could have injuriously affected this defendant. It is manifest, from the nature and character of the wound, and from all the circumstances which were in proof, that the perpetrator of the bloody deed could have had no other design than to take the life of his unconscious victim, and that the homicide was a deliberate, willful and premeditated killing. This consideration and construction which we have given to the statute, will settle its meaning in New Jersey, and be useful in establishing an *uniform rule* of construction in all our criminal courts.

The fourth exception was taken to a statement made by Mr. Schenck, that Moses said " Donnelly had cut his throat."

The fifth was taken to a statement made by Mr. Smith, that when he first was in the room in the morning, Moses said that " Donnelly had killed him." And

The sixth was taken to a statement made by Francis Brough, that when he asked Moses what the matter was, he replied, that " Donnelly had cut his throat."

None of these statements were made in Donnelly's presence, and being simply hearsay they are inadmissible, unless they fall within the exception made in favor of *dying declarations.* Such declarations are received as evidence from necessity for furnishing the testimony, which in certain cases is essential to prevent the manslayer from escaping punishment. When a death wound is inflicted in secret, as was done in this case, no person can be expected to speak to the fact except the victim of the violence. His account of the circumstances of his injury,

given *in articulo mortis*, when intelligibly repeated to a jury, is received by them under the like sanction as all oral testimony is received, the sense of impending death being equivalent to the sanction of an oath. But all statements made by persons on the eve of dissolution do not come within the exception. The application of it is limited to cases of homicide, " where the death of the deceased is the subject of the charge, and the circumstances of the death are the subject of the *dying declarations.*" 1 *Greenl.,* § 156.

But before such statements can be admitted as evidence, it must clearly appear to the court that at the time of his making them, the declarant was under the sense of impending death. For proof of that state of mind and consciousness the court may look to the nature of the injury, the extent of the wound, the condition of the declarant, the notice (if any) given by physicians to him that certain dissolution will follow from the injury, his own expressions of his sense of his peril, and such other facts and circumstances as naturally would tend to show whether he had an *abiding impression* of almost immediate dissolution. It is this *impression* upon the mind, and not the fact of the quick succession of death after the declarations, that makes the testimony admissible before a jury.

In such cases the question before the court always is, whether the deceased, at the time of making his statements, was so conscious of his approaching death that the nearness of his end was calculated to lay upon him as strong an obligation to speak the truth as is imposed by an oath in a court of justice.

Francis Brough was an employee in " the Sea View House," and went into Moses' room after he was stabbed. His impression was, that he was the first person who entered after Moses returned from the hall ; but from the testimony of other witnesses, it is probable that one or two persons were in there before him, especially Mr.

Smith, the proprietor. Brough found Moses on the bed in No. 34, when he put to him the question, and received the answer, which were excepted to. Mr. Smith previously had testified that he found Moses lying on the bed, from which he never again rose, bleeding very profusely from the neck; and that Moses *then* told him the cause of the blood, and by whom he had been hurt.

The question thus preliminarily raised before the *court* did not affect the weight of the testimony—it simply involved its legal admissibility.

In view of the facts which then were before the judge, I think that he committed no error in receiving the evidence.

After an extended principal and cross-examination, in which Mr. Smith had related all that he knew of the condition of Moses, and what had occurred in the room, he was recalled, and he then testified that, when he first entered the room in the morning, Moses put up his hands, called him by name, and said, in succession, that he had been stabbed; that he had been murdered; that his throat had been cut. The witness asked him by whom, and for what cause; to which he replied: "Donnelly, your book-keeper." The circumstances under which the charge was then made against Donnelly, and the condition of the declarant at the time of making it, were clearly sufficient to *legalize the testimony.*

The remaining exception of this class was taken to a statement made by Mr. Schenck, the proprietor of an adjoining public establishment. He said that he found Mr. Connery, Donnelly, and a number of persons in the room. Mr. Connery was trying to staunch the blood, and Donnelly was standing by the foot of the bed; that he heard Connery tell Moses that he could live but a short time. The witness went out, and returned with Mr. Strader and Mr. Wilson; only those three were there in the room with Moses. Mr. Strader asked Moses if he was aware that he could not live but a short time—but a few minutes?

He nodded his head and said, " Yes." Mr. Strader then said, be sure you don't accuse any one wrongfully. Moses then said that " Donnelly cut his throat," " the book-keeper." If that declaration, thus made *in extremis*, was erroneously admitted in evidence, it would be difficult to imagine a case in which *dying declarations* could legally be laid before a jury.

The *eighth* exception in order was the first one taken after the judge had given his charge to the jury. It appears to me that the objection on which it rests would have been more correctly presented in a request to the court, made at or before the closing of the testimony, to overrule all the *dying declarations* of the deceased.

The court, however, was asked to charge the jury " that, if they were satisfied that Moses had no belief in God and in a future state of rewards and punishments, they *must* disregard his dying declarations." The objection certainly related to the competency of the testimony, and not to its weight.

Bearing in mind the grounds upon which we have said that dying declarations are admissible, to wit, that the declarant is considered to be in the relation of a witness, it follows that, whatever would disqualify a witness, would make such declarations incompetent testimony.

Persons deficient in understanding, and those who are *insensible to the obligations of an oath,* from defect of religious sentiment and belief, in which class are included such as have become infamous by being convicted of heinous crimes, are incompetent to be sworn as witnesses; and whether a person falls within the exclusion or not, is a pure question of law for the court. But it sometimes happens that the party to be affected by testimony does not discover the disqualification until after the oath has been administered to the witness. He does not, however, by omitting to make an objection *in limine*, under such circumstances, remove the incompetency; but, when the disqualification be established, he may then ask the court

Donnelly v. State.

to overrule what may have been said by the witness, and to remove him from the stand.

The judge did not refuse to entertain the objection when and in the way it was made. He instructed the jury that the law was correctly stated by the counsel for the defence; but he also said that the law *presumes* that the declarant had such belief, until the contrary be proved; and that the jury must be satisfied by the evidence that such was the fact. The only point of debate is, whether the presumption of law was rightly stated by the judge.

In 1 *Greenl. on Evidence*, § 370, the principle is put in clear and intelligible terms. The distinguished writer says, " It should here be observed that defect of religious faith is *never presumed*. On the contrary, the law presumes that every man brought up in a Christian land, where God is *generally* acknowledged, *does* believe in him, and *fear* him. The charity of its judgment is extended alike to *all*. The burthen of proof is not on the party adducing the witness to *prove* that he *is* a believer, but it is on the objecting party to *prove* that he is *not.*"

In this case the judge did not err by instructing the jury that they must be satisfied by the *evidence* that Moses was a disbeliever.

The *ninth* exception in order, it being the second taken after the charge, relates to facts which it was insisted were sufficient to show that Moses' declarations were not entitled to credit. The judge was requested to tell the jury, " that the fact of Moses not restoring the money, which he said he had won at gaming, to its rightful owner, is evidence of a depraved heart; also, that the fact of his making no reference to a future state, but smiling in derision when spoken to on the subject (if the jury believe he did so) is evidence of a like character and effect." The judge thereupon charged the jury, " that they would give those facts just such weight as they thought they deserved, in reference to the credit due to the statements of

Moses.   The weight of these facts is a question of which the jury are the sole judges."

In directing the jury to determine the weight which should be given to the *dying declarations*, from a review and consideration of the facts which were in evidence prejudicial to the declarant's moral and religious character, the judge fell into no error.

The *tenth* exception was taken to the response of the court, when asked to charge that if the jury believed that Moses had been wounded two hours when Mr. Munter, the surgeon, entered his room, the evidence of the defendant's guilt was insufficient.   There was nothing in the instructions thereupon given by the court to the jury of which the defendant can complain, as having prejudiced him in maintaining his defence upon the merits.

The *sixth*, and only remaining assignment of error, alleges that the verdict of the jury is repugnant, inconsistent, and void.

The first four counts in the indictment charge the plaintiff in error with murdering one Albert S. Moses, on the first day of August, 1857.   The fifth count charges him with murdering, on the first day of August aforesaid, a certain male person, whose name was to the jurors unknown.   The jury found him guilty of the felony and murder charged in the first four counts, and not guilty of the felony and murder charged in the fifth count.   In the first count, he is charged to have inflicted the mortal wound with a dagger ; in the second count with a dirk made of iron and steel ; in the third count with a knife ; and in the fourth count with a dirk-knife.

The objection made against the verdict is, that the accused was found guilty of committing *one* murder in four different ways, each of which caused death ; and that the facts found by the jury are impossible and irreconcilable with each other.

The Supreme Court, in their opinion delivered by the Chief Justice, correctly disposed of this assignment of

Donnelly v. State.

error. He says that the same evidence which would convict the prisoner upon one of those four counts would be sufficient to convict him upon each of the others. It is well settled that "the proof of the instrument wherewith the fact is done is not absolutely necessary to the proof of the fact itself," provided it be proved that the deceased suffered the same kind of death as charged in the indictment. "If, therefore, it was proved, to the satisfaction of the jury, that the crime charged was committed by the defendant, it was immaterial whether the mortal wound was given with a dirk, a dagger, a knife, or a sword."

The authorities in support of the law as declared by the Supreme Court, are numerous in England and in this country, but time will not permit me now to cite or to review them in detail. We fully agree in the reasoning of that court, and are of opinion that the verdict is not repugnant nor inconsistent.

Having thus carefully examined all the points which have been presented to, and most ably argued before the court, against the legality of the conviction of James P. Donnelly. and finding in none of them any error upon which, according to the constitution and laws of this state, the judgment of either of the courts below should be reversed, I am of opinion that the judgment of the Supreme Court must in all things be affirmed.

The CHANCELLOR (dissenting.) I concur entirely in the opinion which has been read, upon all the points except two, the second and seventh exceptions, taken during the progress of the trial. In a case of so much importance, and upon the issue of which the life of a fellow being depends, I feel it my duty to give the reasons which have influenced my judgment in differing from my brethren, who have concurred in all the points in question.

The second exception, taken upon the trial in the Oyer and Terminer, was to the following question, asked by

the counsel of the state, and which, notwithstanding the objection, was admitted by the court: "*How much money did Moses say there was?*" It does not appear, by the bill of exceptions, that when the question was objected to, the grounds of the objection were stated by the counsel. If, therefore, it appears that, in any point of view, the question was competent, the exception must be overruled. It is unnecessary to state the facts of the case, or the position in which the cause stood at the time the question was put, in order to show its important bearing in establishing the chain of circumstances which proved, as was insisted, the guilt of the accused. It is admitted, on all hands, that the facts which the admission of this question introduced as evidence in the cause, were important to the issue, and tended very greatly to the prejudice of the prisoner. Indeed, when we recur to the argument before this court upon this exception, we can well imagine with what force and power the facts, consequent upon the admission of the question, were used to influence a jury in their verdict. The question was important, as is stated in the opinion of the Supreme Court, as tending to show a *motive* for the homicide, as showing the condition of Moses' mind after he received the injury, and as a part of the transaction in which the deceased pointed out where his property was, and directed what disposition was to be made of it. If the question was competent upon any of these grounds, it was used for much more potent purpose before the jury. The fact introduced by that question, which the judge in his charge to the jury alluded to when he told them, "one sentiment, the holiest of earth, filled the breast of the dying boy, the memory of his mother," was as indelibly fixed upon the hearts of that jury as any other fact in the whole case; and how far it went to convict the prisoner, it would be difficult to conjecture. I do not mean to suggest that any fact, which was introduced as a consequence to the admission of the question in dispute, was, in the slightest degree, perverted from its legiti-

mate object, or used for any improper purpose, or any purpose of even questionable propriety. If it was competent for the state to show, *for any purpose*, that the deceased, in the hour of death, disposed of his property, and gave a part of it to his mother, it was not improper for the counsel of the state to comment upon that evidence, as an answer to the allegation, which was most forcibly insisted upon by the counsel of the defendant, that the declarations of Moses were not to be credited, on account of his wicked and depraved mind. But the more important the inquiry was to the issue involved, and the more prejudicial to the defendant, in the use made of it by the prosecution, so much more important was it, as well to the due administration of justice, as to the right of the accused, that it should have been overruled, if the mode of proof was not competent to introduce the evidence to the consideration of the jury. This is purely a question of law. No matter how overwhelming the evidence may be, as to the defendant's guilt, a court must always bear in mind that the *principles* they establish are of universal application, and that their proper maintenance is as necessary for the protection and security of the innocent, as for the detection and condemnation of the guilty. Deeply impressed with the vital importance of this sentiment to the right administration of justice, I disembarrass myself of the impression made upon my mind as to the guilt or innocence of the defendant by the evidence, and approach the consideration of the matters involved insensible to everything but the duties of the judge.

The grounds upon which it was insisted by the counsel of the state that this evidence was competent to go to the jury, were—first, to show a motive for the homicide; second, as showing the condition of mind of Albert S. Moses after he received the mortal wound; and third, to prove the testamentary disposition of his property, as an evidence that he was under the apprehension of death, so as to render competent his *dying declarations* in respect to

the homicide. It will be seen by reference to the opinion of the Supreme Court, that these same grounds were urged in that court in support of the admissibility of this evidence, and that the court sustained its competency upon each and all of them.

That the evidence was material to the issue, and had a tendency to reveal the motive which actuated the defendant to the commission of the deed, cannot be controverted. But I cannot see how it is, because such was its tendency and materiality, that the *declarations* of Moses were, for those reasons, competent to prove the facts.

The objection to the evidence was not on account of its irrelevancy to the issue, or because it was not competent to prove the motive which induced Donnelly to commit the crime, but the objection was as to the *mode of proof*—to the *declarations* of Moses as competent evidence to establish the facts, which, it was insisted, tended to prove the motive. Undoubtedly it was competent to prove the motive. But that does not establish the legality of the evidence by which it was attempted to prove the motive. It leaves the question untouched—were the *declarations* of Moses competent evidence to go to the jury to prove a fact which tended to establish a motive for the homicide? Upon what rule of evidence were the declarations of Moses competent for such a purpose? They were not offered, nor can it be pretended that they were admissible as " *dying declarations.*" Such declarations are admissible only to show the fact of the homicide and its concomitant circumstances. The principles upon which they are admissible are peculiar to cases of homicide. Such declarations are said (in 1 *East P. C.* 353) to be admissible from *necessity*, since it often happens that there is no third person present to be an eye-witness to the fact, and the usual witness in other felonies, viz., the party injured, himself, is got rid of. But the admissibility of such evidence has been placed on a broader basis. Eyre, C. B., (in *Woodcock's case*, 1 *Leach* 502), says that the general principle upon which evidence of this kind is admitted is, that it is of declara-

tions made in extremity, when the party is at the point of death, and when every hope of this world is gone; when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth. A situation so solemn and so awful is considered by the law as creating an obligation equal to that which is imposed by an oath. The reason of the rule is certainly not accurately stated, either in East or by Eyre, C. B. If the rule was founded in *necessity*, only, then the rule would be inapplicable where the necessity ceased. And yet I do not think it can be doubted but that the "dying declarations" of the injured party would be held, admissible, notwithstanding the fact that a third person witnessed the deed, and could testify to every circumstance to which the dying declarations related. Nor can it be correct that the court have adopted the rule solely on the ground that the situation of a man *in articulo mortis* is considered as creating an obligation equal to that which is imposed by an oath. The admissibility of the evidence upon such a principle would extend it to cases other than homicide. And yet the rule of evidence is extended to no other criminal case, and as is now well settled, has no application in civil cases. In *Rex v.* Spesbury, Coleridge very appropriately remarks that this species of proof is an anomaly, and contrary to all the rules of evidence; and yet it is of a character to have the greatest weight with the jury. Neither Coke, Hale, nor Hawkins, in their respective treatises upon criminal law mention any such rule of evidence.

But it is unnecessary, for the purpose of a right decision of the two exceptions we are investigating, to examine either into the origin of the rule, or to ascertain accurately the limits within which courts have circumscribed its admissibility. As "dying declarations," the evidence we are now considering was not offered. As such, its propriety cannot be maintained, unless it can be shown that such evidence may be extended to facts and circumstances not connected with the acts of the homi-

cide, but independent of it, and to be corroborated by other evidence, in order to make good a link in a chain of circumstantial testimony to establish the guilt of the accused.

" *There was ninety-one dollars in different parcels; he said sixty-one dollars of it was his money, and the rest belonged to Mr. Lent; he told me where I would find the money; he said the money was in his bed, between the mattresses; he said it was wrapped up in a bundle; he did not specify what it was wrapped in; Moses told me he wanted his sixty-one dollars sent to his mother.*" But I need not repeat any more of the evidence given in reply to the question which was objected to. There was much more of it of a like character. Then followed its corroboration by other proof, that the money was found between the mattresses, wrapped up in a bundle, and in amount corresponding with the statement of Moses. It cannot be pretended that the declarations of a third person, as to these facts, would have been competent evidence to go to the jury, no matter how accurate their corroboration by other proof. Yet the declarations of Moses, standing on precisely the same principle as to their competency, with the single exception of the rule applicable to " *dying declarations,*" are admitted as competent, on the ground of their being material to show motive for the homicide. The *facts* were perfectly competent to be proved. The *declarations* of Moses to prove them were not competent, upon any rule that ever has been established or recognized in the administration of criminal jurisprudence.

But again, it is insisted that the evidence was competent for the purpose of showing the state of Moses' mind at the time he made his dying declarations, and to show that the injury he had received had not impaired his memory or judgment. The question, as to the competency of this evidence, was raised upon the examination of the first witness who testified in reference to facts connected with the homicide. There had been no · opportunity, on the part of the defence, to cross-examine. There had

been no intimation of any intention, on the part of the defence, to question the strength or composure of mind of Moses, the wounded man. This then raised the direct question whether it is competent for the state, for the purpose of showing that the dying declarations are to be relied on, and full credit to be given them, to prove the declarations of the injured man as to facts going to show a motive for the homicide?

If the question is answered in the affirmative, then it follows that dying declarations are not confined to facts which occurred at the time of the homicide, but that, by them, the state may prove facts establishing a motive for the homicide, which occurred long anterior. It is true they are not admitted on the ground that it is competent to prove the motive by dying declarations. It is not denied but that they are incompetent for any such purpose. But being once admitted on a *pretext* of showing the strength of mind and unimpaired intellect of the dying man, they may be used for a purpose entirely different, and much more potent against the defendant. A rule of evidence is thus established, by which evidence, otherwise incompetent, is admitted under false pretences. The history of this case, and the purpose for which the facts, when once admitted, were used, show most satisfactorily the danger and injustice of such a rule. We cannot close our eyes to the fact that the evidence was not originally offered by counsel, or admitted by the court, upon any such ground as is now alleged, and that it was not necessary for any such purpose. It was perfectly proper for the prosecution to show the state of Moses' mind, and how it was affected by the injury he had received, and for this purpose to inquire, perhaps, whether he conversed with intelligence, spoke of his friends and property, and, generally, what were the subjects of his conversation; but it was not competent for such a purpose, and as in this case, under the mere pretence of introducing evidence for such purpose, to prove, by Moses' declarations, facts and cir-

cumstances tending to show a *motive* for the homicide, which was not competent to be proved by the declarations of the injured man, or by the declarations of any one, except of the defendant himself.

There is one other ground upon which it is contended that the evidence is competent. It is said it proved the testamentary disposition of his property by the deceased, and that such evidence is competent to show that he was under apprehension of approaching death, and thus to lay the foundation for the admission of dying declarations. But can it be possible that the evidence was admissible on this ground? It was pertinent and proper to show the fact that the deceased made a testamentary disposition of his property; but where is the authority, or what plausible reason can be given, to make it competent to give in evidence the details of such disposition? It is competent to show that deceased made a will, because the fact shows that he was under the apprehension of approaching death. But who will pretend that it is competent to give that will in evidence, and to read its contents to the jury? How does the amount of property which he disposed of, or the manner of its disposition, or whether it is done intelligibly or otherwise, throw any light upon the point to be elucidated, *his apprehension of approaching dissolution?* It was competent for the prosecution to show that the deceased made a testamentary disposition of his property, but it was not competent to show the *particulars* of that disposition. I think the Court of Oyer and Terminer erred in the admission of this evidence. I can see no ground upon which its admissibility can be sustained.

As to the seventh exception, the question was asked by the counsel for the state, "*What did Moses say, in the presence of Donnelly, was the occasion of Donnelly's doing it?*" As is properly remarked, in the opinion of the Supreme Court, the evidence was not offered as a "*dying declaration,*" but as a statement made in Donnelly's presence, and not denied. It may be proper to say, however, that the question was not competent in the view of the admis-

sibility of dying declarations as evidence, for the obvious reason that such declarations are confined to statements of facts, and do not extend to matters of opinion. But the evidence was offered and admitted as a statement made in the presence of the accused. In this point of view, was it competent?

In order to judge of the competency of the evidence, we must ascertain the situation of the accused at the time the statement was made. It is not the statement by which the accused can be prejudiced, but by his own conduct when the statement was made. Within one hour after the deed was committed, and while Moses was on his death-bed, where he expired shortly afterwards, Edward D. Connery assumed to act in the capacity of a magistrate. He, with others, and with the accused, had been administering to the necessities of the dying man. Moses had repeated, over and over, that Donnelly had given him the mortal wound while he was sleeping in the adjoining room, *and Donnelly had repeatedly and earnestly denied the accusation.* When the confusion had in a measure subsided, and all had been done for Moses that those present could do, Connery said to the accused, " *As a physician and a magistrate, Mr. Donnelly, I arrest you;*" and, in the language of Connery, " *Mr. Donnelly submitted immediately to the arrest.*" This arrest was made in the entry, near the room where Moses was dying. Connery then summoned six men as jurymen, and with them and the accused, entered the dying man's room. Then each of the assumed jurymen were sworn, and then the oath was administered to Moses to testify, as a witness, touching the homicide. At this point of time it was, and under these circumstances, that the state offered the evidence to prove what Moses said was the occasion of Donnelly's committing the deed. The witness, in reply to the question, went on to state that Moses said he had won from the accused the previous night fifty-five dollars, and that the accused had murdered him to recover the money. The accused made no reply to these statements.

The general rule is, that when a man is charged with a crime, and remains silent under the accusation, his silence is a circumstance which may be left to the jury, from which they may draw an inference of his guilt. But there is an important exception to this rule, and that exception is this: that when the accusation is made at a time and under circumstances which would render anything but silence on the part of the accused indecorous and improper, then it is not competent to prove before the jury the statements which were made charging him with the offence. His silence in such a case is not a circumstance which may be left to the jury. No fact is competent to go to the jury unless the jury have a right to draw some inference from it. They have no right to draw any inference from the silence of the accused under such circumstances, and it follows they have no business with the evidence. 1 *Greenl. Ev.*, § 215; *Commonwealth* v. *Kennedy*, 12 *Metc.* 235. It is the province of the court, and not of the jury, to determine whether a confession be made with that degree of freedom which is necessary to make it admissible evidence. *Wharton's Am. Crim. Law* 258, and *note.* Now it matters not that this was all a *mock trial.* No matter whether it was conducted by an infuriated mob or by a self-constituted committee of vigilance, or by a coroner of a neighboring city, or by a competent tribunal of the state. The accused was in a situation where silence was decent and to be expected, and where he was not at liberty to speak; and the court should have protected him against any inference to his prejudice, which could in any manner grow out of the position he occupied. A confession, although full, circumstantial and complete, "cannot be received in evidence where the defendant has been influenced by any threat or promise, or where it has been extorted by pain, or made under the influence of hope or fear. Thus a confession induced by saying, "if you do not tell me all you know, you will be put in the dark room and hanged, was held inadmissible." *Wharton's Am. Crim. Law* 254, and *notes.* The fear or

hope excited need not be the result of words spoken. A halter around a man's neck, or the rack writhing his limbs, are much more efficacious in extorting from him a confession to escape for the moment, than any mere threat of future punishment.

An intimation has been thrown out, as to some technical difficulty in giving to the accused the benefit of an exception to the evidence, on account of the point of time at which the objection was interposed. In the opinion of the Supreme Court, it is said, " in this case the exception is, not to any rule or action of the court after the answer was given, but to the question itself; and no principle or authority, it is believed, exists, which in the slightest degree impugns the legality of the question." It is alleged that the question to which exception was taken was competent, and that when, upon the answer to the question, it turned out that the evidence was improper, the court should have been called upon to rule it out. This suggestion is made upon the assumption that some answer might have been given to the question, which would have been competent evidence for the consideration of the jury. But is it true that any answer could have been made to the question, which ought to have been considered as competent evidence to the prejudice of the accused ? I will take the strongest case for illustration. Suppose, when Moses said that the accused had won from him the previous night, fifty-five dollars, and that he murdered him to recover the money, the accused had assented to the statement, ought an admission made under the circumstances to have been permitted by the court to go to the jury ? In my judgment it ought not; and for the reason, that such trifling with the law, such mockery of justice, such profanation in administering oaths to a pretended jury and witness, ought not to have been countenanced in any way by a court of justice, nor have been permitted in the slightest degree to prejudice the accused. The court itself should have vindicated the majesty of the law, and should have protected the accused from any prejudice to

which he could possibly be subjected from its desecration. But if I am wrong in the extent to which I would carry my objection and condemnation of this self-constituted tribunal, I would, in answer to this technical difficulty, place the right of the accused upon the more impregnable position, that if his silence, under the circumstances, was not competent evidence for the jury, and if the whole evidence that followed, or was consequent upon the question, ought to have been ruled out, upon a formal application for that purpose to the court, the exception to the question was a substantial exception to the evidence, and the accused ought not to be deprived of the benefit of the exception on account of the time when or the form in which his objection was interposed. When Moses charged the accused with murdering him for the purpose of recovering the money lost at play on the evening previous, the accused was silent. He was silent because it was indecorous and improper for him to speak. The law declares that silence to an accusation, made under the circumstances that this was made, was not a circumstance to be estimated by a jury as any evidence of an admission of his guilt. When the counsel of the accused took exception to the question which elicited this evidence, it was substantially an objection to the evidence itself; and when the answer to the question turned out to be incompetent evidence to go to the jury, the court should have overruled it, as fairly and substantially embraced within the exception which had been taken. When a man is on trial for his life, it appears to me too technical to deprive him of his rights, and to permit incompetent evidence to go to the jury, because his counsel, after taking an exception to the question which elicited the evidence, did not make a further application to the court to overrule the evidence itself. When the evidence was given in reply to the question excepted to, and it appeared that it was of a character improper to go to the jury, then the court should have interposed, and have given to the accused the benefit of the exception. The court had before them all the

circumstances which surrounded the prisoner, and if, under the circumstances, he was *silent* to the statements made by Moses, all the evidence was incompetent ; because, from such silence, the jury had no right to draw any inference prejudicial to the defendant. Suppose the prosecution had opened to the court what statements of Moses they expected to prove, and the fact that, when made, the accused was silent, and had then asked the question under dispute, it appears to me there cannot be a doubt that the court should have overruled it, as introducing incompetent testimony.

It cannot be that the court would have taken the position that the exception was too soon, and that the question itself was lawful. By such a course the accused would have been prejudiced by the jury's hearing the statements, and, although the court might afterwards have ruled them out, an impression would have been made upon the minds of the jury which no charge of the court could ever efface. It does appear to me that, when that question was asked by the prosecution, and was excepted to, that, under the peculiar circumstances of the case, as it then stood before the court, the court should have sustained the exception. I think the counsel took their exception at the right time, and at the time when they ought to have taken it, in order to insure the full benefit of the exception to their client.

The case of *Rex* v. *Appleby and others*, 3 *Stark. R.* 33, 14 *E. C. L. R.* 152, was an indictment against three of the prisoners for stealing a horse, and against the fourth for having feloniously received the horse, knowing it to have been stolen. On the part of the prosecution it was proposed to prove that, when the prisoners were taken up on the charge and examined before a magistrate, one of them being charged, by the examination of another, with having, jointly with the latter, committed the felony in question, the former did not deny that what was so said was true ; but Holroyd, J., held that it was not competent for the prosecutor to go into such evidence,

and said that " it had been so ruled by several of the judges in a similar case, which had been tried at Chester, and that he was of the same opinion. It will be observed that, in the case cited, the objection was taken in point of time, just as it was here. It was taken *in limine,* when the evidence was offered ; but the judge said it was not competent *to go into such evidence.* It appears to me that the case sustains fully every position I have taken. It decides that, where a man is in custody, and an investigation is going on as to the crime charged against him, the statements that are made at such a time touching his guilt and his silence to the statements, are not competent evidence to go to the jury. It further decides that the proper time for the accused to make his objection is when the evidence is offered. The same points are decided in *Regina* v. *Swineston and Bowyer,* 1 *C. & M.* 593 ; 41 *E. C. L. R.* 323 ; *Rex* v. *Hollingshead,* 4 *C. & P.* 242 ; 19 *E. C. L. R.* 366, and *note* (*a*). As I have before stated, it cannot be at all material, as far as the principle is involved upon which the rule of evidence is founded, whether the investigation turns out afterwards to have been legal or illegal.

It is with great diffidence in my own judgment that I differ from an opinion which has received the assent of every judge of the Supreme Court. But my convictions of duty compel me, in a case like this, to adhere to the judgment I have formed, after giving to the case the best consideration in my power.

*For affirmance*—Judges OGDEN, RYERSON, ARROWSMITH, RISLEY, SWAIM, and WOOD.

*For reversal*—The CHANCELLOR, and Judges CORNELISON and VALENTINE.