SYLLABUS

This syllabus is not part of the Court's opinion.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Court.  In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Kanem Williamson (A-65-19) (083979)**

**Argued January 19, 2021 -- Decided May 10, 2021**

**SOLOMON, J., writing for the Court.**

In this appeal, the Court considers (1) whether the trial court abused its discretion by admitting A.B.'s identification of defendant as a dying declaration; and (2) whether the admission of A.B.'s identification violated defendant's right to confrontation.

On a spring afternoon in 2014, emergency services personnel responded to a shooting in front of a housing complex.  Upon arrival, police found A.B. lying face down in a pool of blood on the steps outside the complex.  Paramedics administered CPR and epinephrine to restart her heart, intubated A.B., and were able to revive her pulse.  A.B. arrived at the hospital about twenty minutes later.

About two hours after being shot, A.B. regained consciousness but was unable to speak because of the breathing tube.  A.B.'s attending physician, Dr. Anastasia Kunac, told A.B. that she had been shot several times, her heart had stopped and been restarted, and an injury to her spine left her a quadriplegic and unable to breathe on her own.  Dr. Kunac also told A.B. that she could die.  Upon learning the nature and severity of her condition, A.B. became visibly upset and started to cry.

Detective Filiberto Padilla arrived at the scene of the shooting.  Following investigative leads, he and other officers spoke with Kanem Morris, defendant's father, who told police that defendant had admitted to shooting A.B. and left shortly before police arrived.  Officers took statements from Morris and another witness, who also implicated defendant in A.B.'s shooting.

Detective Padilla obtained defendant's mugshot photograph and went to the hospital.  He had a videotaped exchange with A.B., who could communicate only by nodding or shaking her head.  Detective Padilla asked whether she knew who shot her; whether she knew where she was at that time; whether she had known the person who shot her for a while; whether the shooter was from the complex; whether the person in the photograph was the person who shot her; whether she had had any arguments with that person that day; and whether she was sure that was the person who shot her.  A.B.

1

nodded in the affirmative to all of the questions except about having had an argument; in answer to that question, she shook her head in the negative.

A.B. died eleven months after the shooting. Defendant was indicted for the murder of A.B. and weapons offenses. Before trial, the State moved to admit into evidence, as a dying declaration under N.J.R.E. 804(b)(2), A.B.'s videotaped statement identifying defendant.

During an evidentiary hearing on the State's motion, the trial court heard testimony from one of the paramedics who responded to the scene of A.B.'s shooting, Dr. Kunac, and Detective Padilla. The trial court found all three to be credible, stating they appeared "calm and composed" with "knowledge of the facts to which they testified." The trial court also found that A.B. was "fully cognizant" of her injuries and "the possibility of her imminent death." The trial court concluded that A.B.'s statement did not violate the Confrontation Clause and admitted the statement. After a trial, the jury convicted defendant of a lesser included offense of murder and of the weapons charges. The Appellate Division affirmed. The Court granted certification, limited to the two questions noted above. 241 N.J. 485, 485-86 (2020).

**HELD:** The trial court correctly admitted A.B.'s statement identifying defendant as her shooter as a dying declaration under N.J.R.E. 804(b)(2), and the admission of A.B.'s statement as a dying declaration does not violate the Confrontation Clause of the Sixth Amendment to the United States Constitution or Article I, Paragraph 10 of the New Jersey Constitution.

1. The dying declaration exception to the rule against hearsay is based on the belief that persons making such statements are highly unlikely to lie. New Jersey has codified the exception in N.J.R.E. 804(b)(2), which states that, "[i]n a criminal proceeding, a statement made by a victim unavailable as a witness is admissible if it was made voluntarily and in good faith and while the declarant believed in the imminence of declarant's impending death." "[B]elief of imminent death," see State v. Prall, 231 N.J. 567, 585 (2018), requires "a settled hopeless expectation that death is near at hand, and what is said must have been spoken in the hush of its impending presence," Shepard v. United States, 290 U.S. 96, 100 (1933). A dying declaration is no less reliable because the victim has survived. "Despair of recovery may . . . be gathered from the circumstances . . . ." Prall, 231 N.J. at 585. "What is decisive is the state of mind." Shepard, 290 U.S. at 100. Determining the declarant's state of mind at the time the statement is made requires consideration of all attendant circumstances. (pp. 17-20)

2. Here, A.B. had been shot five times and was unresponsive with no pulse at the scene of the shooting. When she awoke, A.B. could not speak because of a breathing tube. She learned she could not breathe on her own, her heart had stopped, she was a quadriplegic, and she could die. She remained in critical condition thereafter, which Dr. Kunac

2

described as "at imminent risk of death." And A.B. cried after learning about her condition, demonstrating that she fully appreciated the gravity of her situation. None of the medications administered to A.B. would have impaired her mental state, and A.B.'s nods and head shakes were voluntary movements. Considering the totality of the circumstances in determining A.B.'s state of mind at the time of her statement, A.B.'s identification of defendant was made voluntarily, in good faith, and while she "believed in the imminence of [her own] impending death" with no hope of recovery. N.J.R.E. 804(b)(2); see also Prall, 231 N.J. at 585. The trial court did not abuse its discretion in admitting A.B.'s dying declaration identifying defendant. (pp. 20-22)

3. Article I, Paragraph 10 of the New Jersey Constitution and the Sixth Amendment to the United States Constitution both guarantee a criminal defendant's right to be confronted with the witnesses against him. In Crawford v. Washington, the United States Supreme Court held that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." 541 U.S. 36, 68 (2004). The protections of the Confrontation Clause thus apply to all out-of-court statements that are "testimonial." The Crawford Court intimated that the permissible exceptions to the right of confrontation would be "those . . . established at the time of the founding," id. at 54, and noted the existence of the exception for dying declarations, id. at 56 n.6. The Crawford Court explained that, "[i]f this exception must be accepted on historical grounds, it is sui generis." Id. at 56 n.6. The Court reviews post-Crawford cases in which the United States Supreme Court has raised, but not resolved, whether dying declarations are exceptions to the Confrontation Clause; those include Giles v. California, 554 U.S. 353 (2008), which reaffirmed founding-era common law exceptions to the right of confrontation. The Court also reviews pre-Crawford cases acknowledging that dying declarations were an exception to a defendant's confrontation rights at common law, as well as three eighteenth-century English cases that recognized the exception. (pp. 22-31)

4. The Court infers from Giles that dying declarations do not violate the Confrontation Clause, joining the majority of other jurisdictions to consider the issue. The historical record, the United States Supreme Court's pre-Crawford acceptance of dying declarations as an exception to the Confrontation Clause, footnote six of Crawford, and Giles's tacit acceptance of the exception suggest that the writers of the United States Constitution recognized dying declarations as an established exception to a defendant's right of confrontation at the time of the founding. The Court holds that dying declarations admissible under N.J.R.E. 804(b)(2) -- whether testimonial or not -- do not violate the Federal or State Constitutions. A.B.'s statement is admissible. (pp. 31-34)

   **AFFIRMED.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and PIERRE-LOUIS join in JUSTICE SOLOMON'S opinion.**

# SUPREME COURT OF NEW JERSEY

## A-65 September Term 2019

## 083979

State of New Jersey,

Plaintiff-Respondent,

v.

Kanem Williamson,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| January 19, 2021 | May 10, 2021 |

Alison S. Perrone, First Assistant Deputy Public
Defender, argued the cause for appellant (Joseph E.
Krakora, Public Defender, attorney; Alison S. Perrone, of
counsel and on the briefs, and Robert Carter Pierce,
Designated Counsel, on the briefs).

Barbara A. Rosenkrans, Special Deputy Attorney
General/Acting Assistant Prosecutor, argued the cause
for respondent (Theodore N. Stevens, II, Acting Essex
County Prosecutor, attorney; Barbara A. Rosenkrans,
of counsel and on the briefs).

Matthew James Troiano argued the cause for amicus
curiae Association of Criminal Defense Lawyers of
New Jersey (Einhorn, Barbarito, Frost & Botwinick,
attorneys; Matthew James Troiano, on the brief).

1

Jennifer E. Kmieciak, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Jennifer E. Kmieciak, of counsel and on the brief).

JUSTICE SOLOMON delivered the opinion of the Court.

A.B. was shot five times while outside of an apartment complex. One of the shots entered her neck and severed her cervical spine, leaving her a quadriplegic. A.B.'s heart stopped, and her breathing was shallow and irregular when emergency medical technicians (EMTs) arrived. The EMTs restarted her heart, inserted a breathing tube, and took A.B. to the hospital where she remained comatose. A.B. awoke in the hospital about two hours after being shot but remained in critical condition and unable to breathe on her own. The treating emergency room doctor told A.B. that she had been shot several times, her heart had stopped, and an injury to her spine had left her a quadriplegic and unable to breathe on her own. She also told A.B. that she could die. Upon being informed of the gravity of her injuries, A.B. became visibly upset and started to cry.

Police investigating A.B.'s shooting were led to defendant's grandmother's home, where defendant's father told the police that defendant had admitted to shooting A.B. A police detective obtained a photograph of defendant and went to the hospital, where he videotaped his exchange with

2

A.B., who nodded her head to show that she recognized the photograph as a picture of the person who shot her.

Police arrested and charged defendant with aggravated assault and weapons offenses. A.B. died eleven months later. The aggravated assault charge against defendant was then upgraded to first-degree murder.

Before defendant's jury trial, and after a two-day evidentiary hearing, the trial court found A.B.'s videotaped statement admissible as a nontestimonial dying declaration under N.J.R.E. 804(b)(2). Following trial, the jury convicted defendant of aggravated manslaughter -- a lesser-included offense of first-degree murder -- and various weapons offenses. The Appellate Division affirmed defendant's conviction.

This appeal calls upon the Court to answer the following two questions: (1) whether the trial court abused its discretion by admitting A.B.'s identification of defendant as a dying declaration; and (2) whether the admission of A.B.'s identification violated defendant's Sixth Amendment right to confrontation. We find that the trial court correctly admitted A.B.'s statement identifying defendant as her shooter as a dying declaration under N.J.R.E. 804(b)(2). We further conclude that the admission of A.B.'s statement as a dying declaration does not violate the Confrontation Clause of the Sixth Amendment to the United States Constitution or Article I, Paragraph

10 of the New Jersey Constitution, and we affirm the Appellate Division's judgment.

## I.

### A.

The trial and appellate records reveal that on a spring afternoon in 2014, emergency services personnel responded to a shooting in front of a housing complex in Newark, New Jersey. Upon arrival, police found A.B. lying face down in a pool of blood on the steps outside the complex. A.B. had no pulse and was unconscious, unresponsive, and breathing irregularly. Paramedics administered CPR and epinephrine to restart her heart, intubated A.B., and were able to revive her pulse. A.B. arrived at the hospital about twenty minutes later with a pulse, but comatose and unresponsive. At the hospital, doctors maintained A.B. on a breathing tube and gave her several medications that would not have affected her lucidity or consciousness levels.

About two hours after being shot, A.B. regained consciousness but was unable to speak because of the breathing tube. A.B.'s attending physician, Dr. Anastasia Kunac, told A.B. that she had been shot several times, her heart had stopped and been restarted, and an injury to her spine left her a quadriplegic and unable to breathe on her own. Dr. Kunac also told A.B. that she could die.

Upon learning the nature and severity of her condition, A.B. became visibly upset and started to cry.

Detective Filiberto Padilla of the Newark Police Department arrived at the scene of A.B.'s shooting after her removal to the hospital, canvassed the area, and instructed other officers to recover evidence from the scene. Officers recovered a replica handgun, bloody clothing, a cell phone with a bullet hole, and eleven nine-millimeter shell casings. Although detectives did not find any witnesses to the shooting at that time, investigative leads directed them to the home of defendant's grandmother. While there, Detective Padilla and other officers spoke with Kanem Morris, defendant's father, who told police that defendant had admitted to shooting A.B. and left shortly before police arrived. Officers took statements from Morris and another witness, Kareem Brown, who also implicated defendant in A.B.'s shooting.

B.

Detective Padilla obtained defendant's mugshot photograph from a Newark Police Department "arrest and booking data sheet." Detective Padilla folded the photograph to show only defendant's face without any identifying marks. Six hours after the shooting and four hours after A.B. regained consciousness, Detective Padilla arrived at University Hospital to see A.B. Detective Padilla, in the presence of two other detectives, had a videotaped

5

exchange with A.B.  Because of the nature and severity of her injuries, A.B. could communicate only by nodding or shaking her head.

The following exchange took place between A.B. and Detective Padilla:

> DETECTIVE PADILLA:  Listen, if I showed you a picture of who did this, would you know who it is?
>
> . . . .
>
> DETECTIVE PADILLA:  Do you know who shot you?  Just nod your head.  Do you know who -- where you're at, at this present time?  Yes?  The person that did this to you, have you known him for a while?  Is he from the complex?

Detective Padilla then showed A.B. defendant's photograph and asked:

> [DETECTIVE PADILLA:]  Just take a look at this picture, okay?  And tell me if you recognize this person.  You're saying, yes?  -- is the person on this picture the person that shot you earlier today?  Have any -- did you have any arguments with him earlier today in reference to anything?  Yes, or no?  No?  And you -- you're sure that this is the person that shot you?  Yes?"

A.B. nodded in the affirmative to all of the questions, except when asked whether she had an argument with the person she identified; in answer to that question, she shook her head in the negative.  Because of A.B.'s paralysis, Detective Padilla signed the back of defendant's photograph after the identification.

A.B. remained at University Hospital before being transferred to a long-term rehabilitative facility where she remained for six months.  Thereafter,

6

A.B. was transferred to another hospital, where she died eleven months after the shooting. The state medical examiner testified at trial that A.B.'s cause of death was "complications of multiple gunshot wounds" and that her manner of death was homicide.

## II.

## A.

An Essex County grand jury indicted defendant for the first-degree murder of A.B., N.J.S.A. 2C:11-3(a)(1), (2); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a). Before trial, the State moved to admit into evidence, as a dying declaration under N.J.R.E. 804(b)(2), A.B.'s videotaped statement identifying defendant.

During a two-day evidentiary hearing on the State's motion, the trial court heard testimony from John Cronin, one of the paramedics who responded to the scene of A.B.'s shooting, Dr. Kunac, and Detective Padilla. The trial court found all three to be credible, stating they appeared "calm and composed" with "knowledge of the facts to which they testified." The trial court also found that A.B. was "fully cognizant" of her injuries and "the possibility of her imminent death." In particular, the trial court noted that A.B.'s heart stopped and had been restarted, her condition was critical, and

7

A.B. was upset with tears in her eyes upon learning of her injuries. The trial court also found that A.B. made her statement voluntarily and in good faith.

The trial court concluded further that A.B.'s statement did not violate the Confrontation Clause because, although the interview between A.B. and Detective Padilla elicited information, its primary purpose was to enable police to respond to an ongoing emergency. In making that determination, the court noted factors such as where the shooting occurred, the severity of A.B.'s injuries, no indication the threat had ended, and that police were unaware of the shooter's motive.

The trial court granted the State's motion and admitted A.B.'s statement.[1]

B.

At defendant's trial, the State's evidence included testimony from Cronin, Dr. Kunac, and Detective Padilla. Dr. Kunac described A.B.'s condition as "critical" -- "at imminent risk of death" -- during her

---

[1] Defendant subsequently filed a motion to suppress A.B.'s identification pursuant to United States v. Wade, 388 U.S. 218 (1967). The trial court denied the motion, finding that the identification was not impermissibly suggestive and that, even if the identification was impermissibly suggestive, the statement was nonetheless reliable. That conclusion is not challenged before this Court.

identification interview, and she explained that none of the medications administered to A.B. would have impaired her mental state. Dr. Kunac also echoed her testimony from the pretrial hearing regarding A.B.'s injuries. Detective Padilla testified that when he interviewed A.B. at the hospital, she was in a "grave condition" and he "thought she may not make it." He stated, however, that she was alert and understood him. The State also played for the jury the video recording of A.B.'s statement and surveillance video from the housing complex, which showed A.B.'s shooting but not the faces or features of people in the video.

While testifying, Kanem Morris and Kareem Brown both recanted their prior statements to police. The trial court conducted separate Gross[2] hearings for each witness and held their statements to police were admissible as prior inconsistent statements.

When the State called Morris as a witness, he testified that when he arrived at defendant's grandmother's house, defendant "didn't look like himself at all" and told Morris "somebody -- she pulled out." Morris testified that he told his son to stay in the house, that the police were coming, and defendant should "just tell them everything." However, by the time the police

---

[2] State v. Gross, 121 N.J. 1 (1990).

arrived, defendant had fled.  Despite his recantation, Morris also read portions from his statement to the police during his testimony, stating that defendant had told him he shot A.B. after she "pulled out."

Brown testified that he was standing outside of the housing complex and witnessed A.B.'s shooting.  He claimed the shooter was not defendant, but a man nicknamed "Pooh," who had since died.  Brown also testified that he gave the statement at the police station inculpating defendant after Detective Padilla assaulted and coerced him.

The jury convicted defendant of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), a lesser included offense of first-degree murder, and both weapons charges.  The trial court merged the possession of a weapon for an unlawful purpose charge with the aggravated manslaughter charge and sentenced defendant to a twenty-five-year prison term, subject to the eighty-five percent parole disqualifier of the No Early Release Act, N.J.S.A. 2C:43-7.2.  Defendant also received a concurrent eight-year sentence on the unlawful possession of a weapon charge, with four years of parole ineligibility under the Graves Act, N.J.S.A. 2C:43-6(c).

## C.

The Appellate Division affirmed, holding that the trial court did not abuse its discretion in admitting A.B.'s statement identifying defendant.  The

Appellate Division first found that A.B.'s statement was a dying declaration admissible under N.J.R.E. 804(b)(2), because "a similarly situated person would have feared death was imminent" upon learning of the severity of her injuries. The Appellate Division also found that A.B.'s dying declaration did not violate defendant's confrontation rights, since the statement fit within the "ongoing emergency" doctrine, and historic precedent excludes the dying declaration hearsay exception from Confrontation Clause implications "even post-Crawford."[3]

We granted defendant's petition for certification, limited to "the application of the dying-declaration hearsay exception to the victim's photo identification of defendant and the purported deprivation of defendant's Sixth Amendment right to confrontation by admitting the victim's dying declaration photo identification." 241 N.J. 485, 485-86 (2020). We also granted amicus curiae status to the Association of Criminal Defense Lawyers of New Jersey (ACDL) and the Attorney General of New Jersey (Attorney General).

---

[3] Crawford v. Washington, 541 U.S. 36 (2004).

III.

A.

Defendant argues that the State did not establish that A.B. believed her death was imminent, and that her identification of defendant is therefore not admissible as a dying declaration. In support of his argument, defendant draws a distinction between "a belief that death could occur" and "a belief that death is imminent" and points to improvement in A.B.'s condition after she arrived at the hospital.

Defendant also asserts that because A.B.'s statement implicates defendant in a crime, her statement is testimonial and violates defendant's Sixth Amendment right to confrontation. Thus, A.B.'s statement would not be admissible even if it did qualify as a dying declaration, according to defendant. Looking to the United States Supreme Court's opinions in Crawford and Giles v. California, 554 U.S. 353 (2008), defendant contends that the dying declaration exception to the rule against hearsay, as applied today, is not a historical exception to the Confrontation Clause because it is substantially different in its nature, rationale, and application. Defendant thus contends that dying declarations are not exempt from the limitations of the Confrontation Clause.

12

Amicus ACDL supports many of defendant's arguments and warns that admission of A.B.'s statement would "greatly expand" the dying declaration hearsay exception. The ACDL emphasizes that the "critical inquiry" in examining a dying declaration should be the "declarant's awareness of her condition" rather than the severity of the declarant's condition. The ACDL further highlights the time between A.B.'s awareness of her injuries and her statement, and that although A.B. was told that she "could" die, she was not told that she "would" die; her declaration was therefore not made while "under a belief of her impending death."

The ACDL additionally contends that finding A.B.'s statement to be non-testimonial would "greatly expand" the non-testimonial exception to the Confrontation Clause. The ACDL emphasizes that, considering Detective Padilla's intention in speaking with A.B., the actions taken by the police before the identification, and the time between the shooting and the interview, there was no ongoing emergency in this case.

### B.

The State points to A.B.'s injuries and her awareness of the seriousness of the situation and agrees with the Appellate Division that "A.B. had every reason to believe death was imminent." A.B.'s tears upon learning of her condition, according to the State, show that she believed she could die, and the

13

time between the declaration and death is not determinative. Instead, the State argues the deciding factor is the declarant's state of mind at the time of the statement.

The State further maintains, citing Kirby v. United States, 174 U.S. 47, 61 (1899), that dying declarations have existed as "an exception to the right of confrontation" since "well before the ratification of the Sixth Amendment in 1791" and thus are admissible at trial. The State contends that today's dying declaration exception is the same as at the time of the ratification of the Sixth Amendment -- both "requir[e] that the statements be made under the imminent cloud of death and limit[] its admission to homicide trials."

Finally, the State contends that the trial court and the Appellate Division were correct to determine that A.B.'s identification of defendant was nontestimonial because the police had not confirmed the identity of the at-large shooter, and the threat to the community had not yet ended.

The Attorney General largely repeats the State's arguments in asserting the trial court did not abuse its discretion in admitting into evidence, under N.J.R.E. 804(b)(2), A.B.'s videotaped identification of defendant. The Attorney General also notes that, following the decision in Crawford, a majority of courts across the country have accepted dying declarations as an exception to the Confrontation Clause.

14

Emphasizing the record of the motion hearing to show that the elements of the dying declaration exception were met here, the Attorney General states that the trial court and Appellate Division properly considered the factors established in State v. Hegel, 113 N.J. Super. 193, 200-01 (App. Div. 1971), in allowing the admission of A.B.'s statement. The Attorney General also asks this Court to follow the approach set forth in Johnson v. State, 579 P.2d 20, 25 (Alaska 1978), a case from the Alaska Supreme Court that rejected the "overly demanding" requirement "that the declarant have abandoned all hope of recovery" in favor of a standard that requires the declarant to "have such a belief that he is facing death as to remove ordinary worldly motives for misstatement."

Finally, contending that the primary purpose of A.B.'s statement was to protect the public rather than investigate the shooting, the Attorney General asserts that the Confrontation Clause is not implicated.

IV.

This appeal involves an evidentiary issue -- the trial court's admission of A.B.'s statement under N.J.R.E. 804(b)(2) as a dying declaration -- and a constitutional question -- whether the admission of A.B.'s statement identifying defendant violated his Sixth Amendment right to confrontation. Our standard of review for each is different.

15

We review the trial court's evidentiary ruling "under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." State v. Prall, 231 N.J. 567, 580 (2018) (quoting Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). "Under that deferential standard, we review a trial court's evidentiary ruling only for a 'clear error in judgment.'" State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Scott, 229 N.J. 469, 479 (2017)). To set aside such a ruling, "we must be convinced that 'the trial court's ruling is so wide of the mark that a manifest denial of justice resulted.'" Prall, 231 N.J. at 580 (quoting State v. J.A.C., 210 N.J. 281, 295 (2012)).

Whether the trial court's admission of a victim's dying declaration violates defendant's Sixth Amendment right to confrontation presents a legal question subject to de novo review. See State v. Wilson, 227 N.J. 534, 544 (2017). We therefore "afford no special deference to the trial court's interpretation of the law or the legal consequences that flow from established facts." State v. Hyland, 238 N.J. 135, 143 (2019).

16

A.

1.

To address the evidentiary question presented -- whether the trial court abused its discretion by admitting A.B.'s identification of defendant as a dying declaration -- we begin with a brief review of the relevant evidence rules.

Hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." N.J.R.E. 801(c). Hearsay is generally inadmissible unless an exception applies. N.J.R.E. 802. One such exception to the rule against hearsay is a declaration made "under belief of imminent death," more commonly known as a "dying declaration." N.J.R.E. 804(b)(2).

Dying declarations "from time immemorial . . . have been treated as competent testimony, and no one would have the hardihood at this day to question their admissibility." Mattox v. United States, 156 U.S. 237, 243-44 (1895). Their reliability was initially based on the rationale that "the sense of impending death is presumed to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of an oath." Id. at 244; see also Donnelly v. State, 26 N.J.L. 601, 617-18 (E. & A. 1857) (stating that a declarant's "account of the circumstances of his injury, given in

17

articulo mortis, when intelligibly repeated to a jury, is received by them under the like sanction as all oral testimony is received, the sense of impending death being equivalent to the sanction of an oath"). The exception continues to apply today "based on the belief that persons making such statements are highly unlikely to lie." Idaho v. Wright, 497 U.S. 805, 820 (1990).

New Jersey has codified the dying declaration exception in N.J.R.E. 804(b)(2), which states that, "[i]n a criminal proceeding, a statement made by a victim unavailable as a witness is admissible if it was made voluntarily and in good faith and while the declarant believed in the imminence of declarant's impending death." There are many recent opinions of our courts applying the dying declaration exception. See, e.g., State v. Brown, 236 N.J. 497, 523-24 (2019) (holding a statement made while the declarant "would have known he was dying" and with personal knowledge as to who killed him "admissible . . . under the N.J.R.E. 804(b)(2) hearsay exception"); State v. Taylor, 350 N.J. Super. 20, 37 (App. Div. 2002) (stating that a dying victim's words identifying who had stabbed him "were admissible as a dying declaration, N.J.R.E. 804(b)(2)"); cf. Prall, 231 N.J. at 585-86 (holding that statements accusing the defendant of starting a fire, made after the declarant awoke engulfed in flames, could not be admitted as dying declarations because they were made without personal knowledge that the defendant started fire).

18

This Court has looked to United States Supreme Court precedent for guidance in interpretating the phrase "belief of imminent death," Prall, 231 N.J. at 585; under that precedent, "[t]here must be a settled hopeless expectation that death is near at hand, and what is said must have been spoken in the hush of its impending presence," Shepard v. United States, 290 U.S. 96, 100 (1933) (quotation omitted). In applying the United States Supreme Court's guidance, our courts have long taken into consideration whether "the declarant was under the sense of impending death." Donnelly, 26 N.J.L. at 618 (emphasis added). Therefore, "[i]t is [the] impression upon the mind, and not the fact of the quick succession of death after the declarations, that makes the testimony admissible before a jury." Ibid. The May 1993 Supreme Court Rules of Evidence Committee's amendatory comment to N.J.R.E. 804(b)(2) acknowledged that supposition by stating that a dying declaration is "no less reliable and trustworthy because the victim has survived."

Further support for the focus on the declarant's mental state is found in our recent decision in Prall -- "[d]espair of recovery may indeed be gathered from the circumstances if the facts support the inference," 231 N.J. at 585 (alteration in original) (quoting Shepard, 290 U.S. at 100) -- and the United States Supreme Court's decision in Shepard -- belief of impending death "may even be gathered, though the period of survival outruns the bounds of

19

expectation. What is decisive is the state of mind," 290 U.S. at 100 (citation omitted).

Determining the declarant's state of mind at the time the statement is made requires consideration of "all the attendant circumstances," including the words spoken to and by the declarant, the weapon used, and the declarant's injuries, physical condition, and demeanor. Hegel, 113 N.J. Super. at 201 (quotation omitted). Or, as the United States Supreme Court directs in Shepard, "the state of mind must be exhibited in the evidence." 290 U.S. at 100 (emphasis added).

2.

A.B. had been shot five times and was unresponsive with no pulse at the scene of the shooting. Epinephrine and CPR restored A.B.'s heartbeat, but she remained unconscious until she awoke in the emergency room. When she awoke, A.B. could not speak because of a breathing tube. She learned she could not breathe on her own, her heart had stopped, she was a quadriplegic, and she could die. She remained in critical condition thereafter, which Dr. Kunac described as "at imminent risk of death." And A.B. cried after learning about her condition, demonstrating that she fully appreciated the gravity of her situation.

20

Although her interview with Detective Padilla occurred a few hours after she first awakened, A.B.'s state was still critical, and she looked to be in "severe condition" during the questioning. Furthermore, none of the medications administered to A.B. would have impaired her mental state, and A.B.'s nods and head shakes were voluntary movements. Considering the totality of the circumstances in determining A.B.'s state of mind at the time of her statement -- the words spoken to and acknowledged by A.B., that she cried when told of the gravity of her injuries, that her assailant used a gun to shoot her five times, and that she was a quadriplegic who could not breathe without a breathing tube -- A.B.'s identification of defendant was made voluntarily, in good faith, and while she "believed in the imminence of [her own] impending death" with no hope of recovery. N.J.R.E. 804(b)(2); see also Prall, 231 N.J. at 585.

We reject the objective standard promoted by defendant that emphasizes "imminent death" rather than "imminent risk of death." Such a standard focuses on the certainty of death -- that the victim will die -- rather than the victim's state of mind at the time of the statement. It eschews decades of our and the United States Supreme Court's jurisprudence resolving whether, under such circumstances, a declarant's statement is admissible.

21

We maintain the existing standard, which considers the state of mind of the declarant in the dying declaration analysis. Even though her death occurred months later, A.B.'s injuries, the communications from her doctor, her distress upon learning of her circumstance, and her condition when she made the statement, evidence A.B.'s "settled hopeless expectation that death [was] near at hand." Shepard, 290 U.S. at 100 (quotation omitted). A.B. believed death was imminent when she made her statement to Detective Padilla. We therefore conclude that the trial court did not abuse its discretion in admitting as substantive evidence at trial, under N.J.R.E. 804(b)(2), A.B.'s dying declaration identifying defendant.

B.

Having concluded that the trial court did not abuse its discretion in admitting A.B.'s identification of defendant as a dying declaration, we turn to whether the trial court's admission of A.B.'s statement violated defendant's right to confrontation under the United States and New Jersey Constitutions. We review that question de novo.

1.

The New Jersey Constitution and the Sixth Amendment to the United States Constitution both "provide that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

22

him.'" Wilson, 227 N.J. at 544 (alterations in original) (quoting U.S. Const. amend. VI; N.J. Const. art. 1, ¶ 10). "The right of confrontation is an essential attribute of the right to a fair trial, requiring that a defendant have a 'fair opportunity to defend against the State's accusations.'" State v. Branch, 182 N.J. 338, 348 (2005) (quoting State v. Garron, 177 N.J. 147, 169 (2003)). Under the Confrontation Clause, criminal defendants are "afford[ed] a procedural guarantee that the reliability of evidence will be tested 'in a particular manner' through 'the crucible of cross-examination.'" Wilson, 227 N.J. at 544-45 (quoting Crawford, 541 U.S. at 61). Our Court has relied on the "standard set forth in Crawford, [whereby] a testimonial statement against a defendant by a non-testifying witness is inadmissible under the Confrontation Clause unless the witness is unavailable and the defendant had a prior opportunity to cross-examine him or her." Id. at 545.

"Our state confrontation case law traditionally has relied on federal case law to ensure that the [United States and New Jersey Constitutions] provide equivalent protection." State v. Roach, 219 N.J. 58, 74 (2014). We therefore look to federal case law in examining the relationship between the dying declaration exception to the rule against hearsay, and the demands of the Confrontation Clause.

23

We begin with Crawford v. Washington, in which the United States Supreme Court held that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."[4] 541 U.S. at 68. The protections of the Confrontation Clause thus apply to all out-of-court statements that are "testimonial." Ibid. But Crawford did not determine whether the right to confrontation displaced all evidentiary rules. In fact, in his majority opinion, Justice Scalia noted that the Sixth Amendment's Confrontation Clause "is most naturally read as a reference to the right of confrontation at common law." Id. at 54. Although the Court stated that the text of the Confrontation Clause "does not suggest any open-ended exceptions from the confrontation requirement," the Court intimated that the exceptions permitted would be "those . . . established at the time of the founding." Ibid.

While the Crawford Court found "scant evidence that [hearsay] exceptions were invoked to admit testimonial statements against the accused in a criminal case," id. at 56, it noted an exception -- "dying declarations," the

---

[4] In so holding, the Court abrogated the previous test established by Ohio v. Roberts, which "condition[ed] the admissibility of all hearsay evidence on whether it [fell] under a 'firmly rooted hearsay exception' or [bore] 'particularized guarantees of trustworthiness.'" Crawford, 541 U.S. at 60, 68-69 (quoting Ohio v. Roberts, 448 U.S. 56, 66 (1980)).

existence of which "as a general rule of criminal hearsay law cannot be disputed," id. at 56 n.6.[5]  Though Crawford did not go so far as to decide "whether the Sixth Amendment incorporates an exception for testimonial dying declarations," the Court explained that "[i]f this exception must be accepted on historical grounds, it is sui generis."  Ibid.

2.

Four years after Crawford, in Giles v. California, the Court again addressed a defendant's confrontation rights when a witness is unavailable to testify at trial; in Giles, however, the focus was on the doctrine of forfeiture by wrongdoing.[6]  554 U.S. at 355.  The defendant in Giles shot his ex-girlfriend several times and was charged with murder.  Id. at 356.  At trial, prosecutors attempted to introduce statements the victim made to a police officer a few weeks before the shooting.  Ibid.  In her statements, the victim described prior

---

[5]  Indeed, contrary to defendant's assertion that the dying declaration exception has changed since the founding, we note that the exception has remained substantially the same in its nature, rationale, and application.  See Wright, 497 U.S. at 820 (citing Mattox, 156 U.S. at 244, and The Queen v. Osman, 15 Cox Crim. Cas. 1, 3 (Eng. N. Wales Cir. 1881), to support the notion that the dying declaration exception is "based on the belief that persons making such statements are highly unlikely to lie").

[6]  Crawford had previously accepted the rule of forfeiture by wrongdoing as an exception to a defendant's confrontation rights on equitable grounds.  541 U.S. at 62.

physical abuse by the defendant, stating he "accused her of having an affair, and that after the two began to argue, [the defendant] grabbed her by the shirt, lifted her off the floor, and began to choke her." Id. at 356-57. She also claimed the defendant "punched her in the face and head" and held a knife up to her, threatening to kill her if she cheated on him. Id. at 357. The trial court admitted the statements, and a jury convicted the defendant of first-degree murder. Ibid. The California Supreme Court affirmed the appellate court's holding that the statements did not violate the Confrontation Clause "because Crawford recognized a doctrine of forfeiture by wrongdoing" and the defendant's "intentional criminal act made [the victim] unavailable to testify." Ibid.

Acknowledging that at common law, "the [forfeiture by wrongdoing] exception applied only when the defendant engaged in conduct designed to prevent the witness from testifying," id. at 359, the United States Supreme Court found that the trial court had failed to consider the defendant's intent -- whether he murdered the victim with the purpose to prevent her from testifying -- and reversed the defendant's murder conviction, remanding for further proceedings, id. at 361, 377. In his opinion in Giles, Justice Scalia recognized that "two forms of testimonial statements were admitted at common law even though they were unconfronted" -- "declarations made by a speaker who was

26

both on the brink of death and aware that he was dying," and those admissible under the doctrine of "forfeiture by wrongdoing." Id. at 358-59. The Giles Court thus reaffirmed founding-era common law exceptions to the right of confrontation. Ibid.

The United States Supreme Court had another opportunity to address dying declarations in the Confrontation Clause context in Michigan v. Bryant, but declined to address the question set forth in Crawford regarding testimonial dying declarations, finding the issue had been waived. See 562 U.S. 344, 351 n.1 (2011). In her dissent, however, Justice Ginsburg acknowledged that "in the law we inherited from England, there was a well-established exception to the confrontation requirement: The cloak protecting the accused against admission of out-of-court testimonial statements was removed for dying declarations." Id. at 395. Justice Ginsburg further stated that had the issue been properly before the Court, she would have "take[n] up the question whether the exception for dying declarations survives . . . recent Confrontation Clause decisions." Id. at 395-96.

The United States Supreme Court has thus raised, but not directly resolved, whether dying declarations are exceptions to the Confrontation Clause, though Justice Scalia acknowledged that "there is authority for admitting even those [dying declarations] that clearly are" testimonial.

27

Crawford, 541 U.S. at 56 n.6 (citing The King v. Woodcock, 168 Eng. Rep. 352, 353-54 (1789); The King v. Radbourne, 168 Eng. Rep. 330, 332-33 (1787); The King v. Reason, 93 Eng. Rep. 659 (1722); Thomas Peake, A Compendium of the Law of Evidence 64 (3d ed. 1808)).  We therefore look to United States Supreme Court decisions predating Giles and Crawford, and to the English common law predating the Sixth Amendment, for further guidance.

3.

Pre-Crawford, the United States Supreme Court acknowledged that dying declarations were an exception to a defendant's confrontation rights at common law.  The Court broadly recognized that dying declarations have "from time immemorial . . . been treated as competent testimony," even though "[t]hey are rarely made in the presence of the accused; they are made without any opportunity for examination or cross-examination, nor is the witness brought face to face with the jury."  Mattox, 156 U.S. at 243.  The Court addressed the issue more directly in Robertson v. Baldwin, where it noted that "the provision that an accused person shall be confronted with the witnesses against him [does not] prevent the admission of dying declarations."  165 U.S. 275, 282 (1897).  In Kirby v. United States, the Court noted the exception's long history:

> It is scarcely necessary to say that, to the rule that an accused is entitled to be confronted with witnesses

28

against him, the admission of dying declarations is an exception which arises from the necessity of the cause. <u>This exception was well established before the adoption of the [C]onstitution</u>, and was not intended to be abrogated."

[174 U.S. at 61 (emphasis added).]

United States Supreme Court precedent pre-<u>Crawford</u> thus acknowledges dying declarations as an exception not only to the hearsay rule, but also to the Confrontation Clause.

Indeed, as is acknowledged in <u>Giles</u> and <u>Crawford</u>, the admission of dying declarations as substantive evidence at trial was well-established by the time of the Sixth Amendment's adoption. <u>Crawford</u> acknowledged such, stating that "[t]he existence of [the dying declaration] exception as a general rule of criminal hearsay law cannot be disputed." <u>Crawford</u>, 541 U.S. at 56 n.6. Whether dying declarations are an exception to the Confrontation Clause, however, is an issue spoken to but not finally resolved by the United States Supreme Court or previously considered by this Court. A brief reference to three eighteenth-century English cases predating the Sixth Amendment to the United States Constitution and cited by the United States Supreme Court in <u>Giles</u> and <u>Crawford</u> is instructive. All three recognized dying declarations as an exception to a defendant's confrontation rights.

29

In 1789, in The King v. Woodcock, mentioned in Giles, 554 U.S. at 362, and Crawford, 541 U.S. at 56 n.6, the witness had given her unconfronted statement to a magistrate. 168 Eng. Rep. at 353. The court noted that a dying witness's statements should be admitted where she "apprehended that she was in such a state of mortality as would inevitably oblige her soon to answer before her Maker for the truth or falsehood of her assertions." Id. at 353-54.

Later, in The King v. Dingler, cited in Giles, 554 U.S. at 363, the court relied on Woodcock but denied the admission of the unconfronted deposition of a witness who "entertained some apprehension of the danger of her situation" but whose death, while "inevitable and approaching," did not seem to be imminent. 168 Eng. Rep. 383, 383-84 (1791). The Dingler court nonetheless recognized that a dying declaration made while under the impression of imminent death would be admitted even if unconfronted. See Peake, supra, at 63-64 (citing Dingler for the proposition that "in cases where the party wounded declared himself apprehensive of death, or was in such imminent danger of it as must necessarily raise that apprehension, [his deposition] may be read as his dying declaration" even if the defendant is not present at the time of the examination).

Finally, in The King v. Reason, cited in Crawford, 541 U.S. at 56 n.6, a victim on his deathbed made statements accusing the defendants of his murder.

30

93 Eng. Rep. at 659. Although the defendants were not present and had no opportunity to confront the declarant, two of his statements were admitted into evidence, and another was excluded on grounds other than the defendants' confrontation rights. Id. at 659-60.

4.

Although the United States Supreme Court has not directly confronted the issue post-Crawford, we infer from Giles that dying declarations do not violate the Confrontation Clause. Giles examined both Woodcock and Dingler and recognized a forfeiture by wrongdoing exception to the Confrontation Clause where the statement either "was confronted or fell within the dying-declarations exception." 554 U.S. at 361-63 (emphasis added). The Giles Court went on to find "conclusive" the "common law's uniform exclusion of unconfronted inculpatory testimony by murder victims (except testimony given with awareness of impending death) in the innumerable cases in which the defendant was on trial for killing the victim, but was not shown to have done so for the purpose of preventing testimony." Id. at 368 (emphasis added). In accepting the common law's formulation of the forfeiture by wrongdoing exception, the Giles Court also acknowledged the dying declaration exception to a defendant's confrontation rights. Furthermore, in later applying Giles, the Supreme Court stated, "[w]e have recognized that the Confrontation Clause

31

does not prohibit the introduction of out-of-court statements that would have been admissible in a criminal case at the time of the founding." Ohio v. Clark, 576 U.S. 237, 246 (2015).  Thus, we find it likely that should the question arise, the United States Supreme Court will find that the Confrontation Clause is not violated by the admission of dying declarations.

Other jurisdictions have signaled their view that the United States Supreme Court is likely to formally adopt dying declarations as an exception to the Confrontation Clause.  For example, the Kansas Supreme Court expressed "confiden[ce] that, when given the opportunity to do so, the Supreme Court would confirm that a dying declaration may be admitted into evidence, even when it is testimonial in nature and is unconfronted."  State v. Jones, 197 P.3d 815, 822 (Kan. 2008); see also Hailes v. State, 113 A.3d 608, 621 (Md. 2015) ("Here, we reach the same conclusion that the Supreme Court has consistently endorsed for more than a century, and hold that the Confrontation Clause does not apply to dying declarations.").  The Court of Appeals of Mississippi, after considering Bryant along with Crawford and Giles, reached a similar conclusion.  Grindle v. State, 134 So. 3d 330, 343 (Miss. Ct. App. 2013) ("[W]e are swayed by the United States Supreme Court's commentary in Crawford and Giles that, were the matter properly before the Court, the exception would be held to apply.").

The historical record, the United States Supreme Court's pre-Crawford acceptance of dying declarations as an exception to the Confrontation Clause, footnote six of Crawford, and Giles's tacit acceptance of the exception suggest that the writers of our United States Constitution recognized dying declarations as an established exception to a defendant's right of confrontation at the time of the founding. We therefore choose to follow a majority of states in interpreting footnote six of Crawford as allowing dying declarations to be an exception to the Confrontation Clause. See, e.g., People v. Monterroso, 101 P.3d 956, 972 (Cal. 2004); Walton v. State, 603 S.E.2d 263, 265-66 (Ga. 2004); People v. Gilmore, 828 N.E.2d 293, 302 (Ill. App. Ct. 2005); Wallace v. State, 836 N.E.2d 985, 993-96 (Ind. Ct. App. 2005); Jones, 197 P.3d at 821-22; Commonwealth v. Nesbitt, 892 N.E.2d 299, 310-11 (Mass. 2008); People v. Taylor, 737 N.W.2d 790, 794-95 (Mich. Ct. App. 2007); State v. Martin, 695 N.W.2d 578, 585-86 (Minn. 2005); Harkins v. State, 143 P.3d 706, 710-11 (Nev. 2006); State v. Calhoun, 657 S.E.2d 424, 426-28 (N.C. Ct. App. 2008); State v. Lewis, 235 S.W.3d 136, 147-48 (Tenn. 2007).

Accordingly, we hold that dying declarations admissible under N.J.R.E. 804(b)(2) -- whether testimonial or not -- do not violate the Confrontation Clause of the United States Constitution or the New Jersey Constitution. As a result, we need not reach the question of whether A.B.'s statement was

33

testimonial. Consistent with <u>Crawford</u>, we conclude that A.B.'s statement is admissible "<u>sui generis</u>" as a dying declaration. <u>See</u> <u>Crawford</u>, 541 U.S. at 65 n.6.

IV.

For the reasons set forth above, the judgment of the Appellate Division is affirmed.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and PIERRE-LOUIS join in JUSTICE SOLOMON'S opinion.